UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

No. 12-cv-8555 (RJS)
_____

NRW, INC.,

Plaintiff,

VERSUS

MIKE BINDRA, *et al.*,

Defendants.

_____

OPINION AND ORDER
September 10, 2014
_____

RICHARD J. SULLIVAN, District Judge:

Plaintiff NRW, Inc. ("NRW") brings this diversity action against Defendants Mike Bindra ("Bindra"), Laura De Palma ("De Palma"), Made Event, LLC ("Made Event"), Sala Corporation ("Sala"), EZ Festivals, LLC ("EZ Festivals"), and Mister Ed Productions, Ltd. ("Mister Ed," and together with Made Event, Sala, and EZ Festivals, the "Entity Defendants"), asserting claims for breach of contract, alter ego liability, and fraudulent transfer. Now before the Court is Defendants' motion to dismiss the Fourth Amended Complaint. For the reasons set forth below, the motion is granted in part and denied in part.

I. BACKGROUND

A. Facts

This case arises out of a financing arrangement gone awry between Bindra and NRW's principal, Henri Pferdmenges ("Pferdmenges").[1] Bindra and Pferdmenges

---

[1] The facts are drawn from the allegations of the Fourth Amended Complaint (Doc. No. 149 ("FAC")), which are assumed to be true for purposes of this motion, unless contradicted by documents attached to the FAC. In deciding this motion, the Court has considered Defendants' supporting memorandum (Doc. No. 114 ("Mem.")), NRW's memorandum in opposition (Doc. No. 121 ("Opp.")), and Defendants' reply (Doc. No. 123 ("Rep.")), as well as the documents submitted in support thereof (Doc. Nos. 113, 115, 121). *Sira v. Morton*, 380 F.3d 57, 67 (2d

were, in happier times, friends and business partners in a night club. (FAC ¶ 10.) In October 2008, Bindra conceived of a new business venture: an electronic music festival called "Electric Zoo" to be held on Randall's Island in New York City. (*Id.* ¶ 12.) He planned to host the first such festival in 2009 ("Zoo 2009") and to eventually expand the festival to other cities. (*Id.* ¶¶ 12–14.) Bindra and his wife, De Palma, approached Pferdmenges with the idea and, from October 2008 to February 2009, sought an investment from Pferdmenges. (*Id.* ¶¶ 11–15.) On February 25, 2009, Bindra, De Palma, Pferdmenges, and Pferdmenges's attorney met at Pferdmenges's house in Florida to discuss the terms of a possible deal. At that meeting, the parties reached an "understanding" about a possible deal structure, under which Pferdmenges would invest in the festival as a fifty percent partner. (*Id.* ¶¶ 20–21.)

Following the meeting and through July 2009, the parties continued to negotiate via email. (FAC ¶¶ 23–27.) Discussions reached an impasse, and on July 2, 2009, Pferdmenges sent Bindra an email threatening to cut off negotiations unless Bindra and De Palma agreed to either the "initial offer (50/50)" discussed at the February 25 meeting or "a straight loan." (*Id.* ¶ 27; *id.* Ex. G.) In response, Bindra sent an email agreeing to "move forward under the 50/50 deal." (*Id.* ¶ 27; *id.* Ex. G.)

On July 9, 2009, Pferdmenges wired $200,000 to Made Event, an entity owned by Bindra and De Palma, so Bindra and De Palma could use the funds to pay various expenses incurred by Zoo 2009. (FAC ¶¶ 4, 29.) On August 3, 2009, Pferdmenges sent Bindra a proposed written letter agreement entitled "Letter Agreement between NRW Corporation, a Florida corporation ('NRW') and Sala, LLC, a Delaware limited liability company ('Sala') regarding Electric Zoo Festival 2009 at Randall's Island ('Zoo')" (the "Letter Agreement"). (Compl. ¶ 30; *id.* Ex. I ("Ltr. Agmt.").) The Letter Agreement, which is discussed in greater detail below, set forth the terms of a deal between NRW, an entity controlled by Pferdmenges, and Sala, an entity controlled by Bindra. (Ltr. Agmt. at 1; FAC ¶ 33.) It provided that NRW would invest $500,000 into an entity called Silly Groove, LLC ("Silly Groove"), which would operate Zoo 2009. (Ltr. Agmt. § 2.) In return, Sala would, after paying back NRW's investment and other liabilities, split the profits from Zoo 2009 with NRW equally. (*Id.* § 4.) Sala would retain ownership of "all trademarks, service marks, goodwill and all other property relating to Zoo and any names, images and other rights," but would enter into a security agreement listing the foregoing as "security for repayment of [NRW's] Investment." (*Id.* § 5.)

In response to Pferdmenges's email attaching the Letter Agreement, Bindra sent an email on August 6, 2009 (the "August 6 email") stating, in relevant part:

> This looks great though, thank you. Only one small typo we caught in paragraph six. I have copied the sentence here and highlighted the typo:
>
> "That notwithstanding, Sala shall not be required to pay NRW more than

---

Cir. 2004) (holding that, on a motion to dismiss, a court may consider, in addition to the complaint, "any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint" (citations and internal quotation marks omitted)).

2

one third of its profits from Zoo 2010 for future Zoo[s]."

I think "for" should be "or[.]"

Let me know how Schles [Pferdmenges's attorney, Michael Schlesinger] would like this executed. Should I sign and fax a copy or mail him originals, or both etc? . . .

(FAC ¶ 30; *id.* Ex. J ("Aug. 6 Email").) On August 13, 2009, NRW wired an additional $300,000 to Made Event. (*Id.* ¶ 32.) Although the Letter Agreement called for NRW to make its investment to Silly Groove, Bindra asked NRW to make the investment to Made Event, and Made Event retained those funds to operate Zoo 2009. (*Id.* ¶¶ 32–33.) Neither Sala nor Made Event ever entered into the security agreement contemplated by the Letter Agreement. (*Id.* ¶ 34.)

Zoo 2009 was held on Labor Day weekend in 2009 and was attended by over 25,000 guests. (FAC ¶ 37.) On September 22, 2009, Bindra sent Pferdmenges a financial statement for Zoo 2009. (*Id.* ¶ 39; *id.* Ex. L.) The statement, which excluded information about any ticket fees received by Bindra and De Palma as compensation and any cash proceeds received at the festival, indicated a net loss of $165,344. (FAC ¶ 39; *id.* Ex. L.) Thereafter, the parties exchanged more emails about the finances of Zoo 2009; in these emails, Pferdmenges, though his attorney, again demanded to know what amount Bindra and De Palma received in ticket fees, and Bindra, through his accountant, again represented that Zoo 2009 lost $165,344. (*Id.* ¶¶ 42–47.) At around this time, Pferdmenges expressed his willingness to leave the entire $500,000 investment with Defendants for future Electric Zoo festivals.

(*Id.* ¶¶ 41, 43.) On January 29, 2010, Bindra wired $200,000 of NRW's investment back to NRW, but retained the remaining $300,000. (*Id.* ¶ 44.)

In July 2010, Bindra and De Palma created EZ Festivals, a new corporate entity to "hold the investments, working capital and profits of Electric Zoo." (FAC ¶ 48.) Made Event, the entity through which Bindra and De Palma previously operated Electric Zoo, transferred approximately $700,000 to EZ Festivals, which was owned wholly by De Palma. (*Id.* ¶ 49.)

On July 12, 2010, Bindra sent Pferdmenges an email (the "July 12 email") proposing two possible financing deals for the Electric Zoo festival to be held in 2010 ("Zoo 2010"). (FAC ¶ 51; *id.* Ex. R.) Under the first proposal ("Proposal One"), Pferdmenges would make a $500,000 investment and receive the first $750,000 in profits, Made Event would receive the next $750,000 in profits, and the parties would thereafter split the profits, with ten percent going to Pferdmenges. Under the second proposal ("Proposal Two"), Pferdmenges would make a $500,000 investment and receive interest on the investment at a rate of ten percent, plus a twenty percent share of the profits from all future Zoos, including ticketing revenues. (*Id.* Ex. R.) On July 25, 2010, Pferdmenges told Bindra that he intended to stick to the terms of the "50-50 deal agreed upon approximately a year before, as reflected in the August 2009 letter agreement, as confirmed by both performance and subsequent writings." (*Id.* ¶ 54.)

Zoo 2010 was held, once again, over Labor Day weekend, and was attended by over 50,000 guests. (FAC ¶ 55.) After the festival, Bindra and his accountant, Andrew Britton ("Britton"), emailed Pferdmenges financial statements for Zoo 2010. (*Id.*

3

¶¶ 58–59.) These statements reflected a profit of approximately $1,473,000 and categorized NRW's investment as a $500,000 "loan." (*Id.*; *id.* Exs. S, T.) According to these statements, EZ Festival would pay NRW $50,000 in interest (reflecting ten percent interest on the $500,000 loan) and $294,600 in profits (reflecting twenty percent of the total profits). (*Id.* Exs. S, T.) In one of the emails, Bindra stated that these payments reflected the terms of Proposal Two of the July 12 email. (*Id.* Ex. T.) After Pferdmenges again communicated his view that he was entitled to fifty percent of the profits, Bindra sent an email on December 10, 2010, disputing that the parties "agreed upon a 50/50 deal, ever" and reiterating that such a deal was "never agreed upon." (*Id.* Ex. U.) On December 29, 2010, EZ Festivals wired NRW the following amounts: (1) $300,000 in profits, (2) $20,000 in interest, and (3) $30,000 in "additional interest." (FAC ¶ 61; *id.* Ex. V.) NRW accepted these funds without conceding that they constituted the payments to which it was entitled. (FAC ¶ 61.)

The parties' relationship deteriorated quickly thereafter. On April 18, 2011, an attorney for Bindra and De Palma sent Pferdmenges a letter disputing that Pferdmenges ever held any equity in Electric Zoo, and purporting to terminate any business relationship that might exist between Pferdmenges, NRW, and Defendants. (FAC ¶ 64; *id.* Ex. X.) Bindra thereafter excluded Pferdmenges from participation in Electric Zoo festivals, including the festivals held in 2011, 2012, and 2013 (respectively, "Zoo 2011," "Zoo 2012," and "Zoo 2013"). (*Id.* ¶¶ 65–69.)

Throughout this entire period, Made Event and EZ Festivals made a number of payments – to Bindra, De Palma, Made Event, and a separate corporate entity called Mister Ed – that NRW alleges were intended to fraudulently divert funds from the accounts of Made Event and EZ Festivals. (FAC ¶¶ 70–74; *id.* Exs. AA, BB.)

In July 2013, Made Event and EZ Festivals announced that they were being sold to SFX Entertainment ("SFX") for $45,000,000. Pferdmenges and NRW received no proceeds from this sale. (*Id.* ¶¶ 76–77.)

B. Procedural History

In June 2012, Pferdmenges and NRW brought suit against Defendants[2] in Florida state court. On July 20, 2012, Defendants removed the case to the United States District Court for the Southern District of Florida on the basis of diversity jurisdiction. (Doc. No. 1.) Pferdmenges and NRW did not move to remand. Instead, the parties litigated Defendants' motion pursuant to 28 U.S.C. § 1404(a) to transfer the action to the Southern District of New York. (Doc. Nos. 31, 37, 41.) On November 20, 2012, the Honorable K. Michael Moore, District Judge, granted Defendants' motion, and transferred the case to this District, where it was assigned to my docket. (Doc. No. 43.) Following a status conference before the Court, Pferdmenges and NRW filed a Second Amended Complaint[3] on January 23, 2013, asserting claims for breach of a contract, breach of fiduciary duty, declaratory relief, unjust enrichment, promissory estoppel, implied contract in fact, and fraud in the inducement. (Doc. No. 54.)

---

[2] Mister Ed was not named as a Defendant in the initial suit. (*See* Doc. No. 1.) As discussed below, it was added in the Third Amended Complaint.

[3] Pferdmenges and NRW filed the First Amended Complaint while the case was still pending before Judge Moore. (Doc. No. 29.)

4

On February 5, 2013, Defendants filed a motion to dismiss the Second Amended Complaint, which was fully submitted on February 20, 2013. (Doc. Nos. 57, 63, 64.) At a conference on July 11, 2013, the Court granted Defendants' motion, finding that the contract alleged by Pferdmenges and NRW was contradicted by documents attached to the Second Amended Complaint. (Doc. No. 86 at 3:11–5:9.) The Court dismissed the remaining claims as either duplicative of the contract claim or defective as a matter of law, but permitted Pferdmenges and NRW to amend their complaint to assert a breach of contract claim consistent with the documents attached to the Second Amended Complaint, as well as claims for alter ego liability and fraudulent transfer. (*Id.* at 5:10–7:4; Doc. Nos. 84, 91.)

On September 27, 2013, NRW filed the Third Amended Complaint, asserting claims for breach of contract, alter ego liability, and fraudulent transfer. (Doc. No. 92 ("TAC").) The Third Amended Complaint dropped Pferdmenges as a Plaintiff and named Mister Ed as an additional Defendant. (TAC at 1.) The Court held a pre-motion conference on November 22, 2013, to discuss Defendants' then-contemplated motion to dismiss the Third Amended Complaint. (Doc. No. 108 ("Nov. 22 PMC Tr.").) At the conference, the Court observed that, based on the Letter Agreement and the August 6 email, NRW had possibly pleaded the existence of a contract between the parties regarding Zoo 2009 and, potentially, Zoo 2010. (Nov. 22 PMC Tr. at 25:22–26:1.) The Court permitted Defendants to file the motion, and ordered discovery to proceed as to Zoo 2009 and Zoo 2010. (Doc. No. 107.) The motion was filed on January 8, 2014 and fully submitted on March 10, 2014. (Doc. Nos. 111, 123.)

On August 18, 2014, the Court issued an Order observing that the Third Amended Complaint does not adequately plead the existence of diversity jurisdiction, but permitting NRW to file an amended complaint correcting the defect pursuant to 28 U.S.C. § 1653. (Doc. No. 142.) On August 27, 2014, NRW filed its Fourth Amended Complaint, which is identical to the Third Amended Complaint, except as to the allegations concerning diversity jurisdiction. (*Compare* FAC ¶¶ 1–9, *with* TAC ¶¶ 1–9.) The Court deemed the parties' briefings and the documents attached to the Third Amended Complaint to be refiled as to the Fourth Amended Complaint. (Doc. Nos. 142, 144.)

On September 4, 2014, NRW submitted a pre-motion letter seeking leave to file a Fifth Amended Complaint asserting additional claims for declaratory judgment, fraudulent inducement, and unjust enrichment based on statements Bindra and De Palma made at depositions. Defendants responded with a letter of their own on September 9, 2014.

II. LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must "provide the grounds upon which [the] claim rests." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). The plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In reviewing a Rule 12(b)(6) motion to dismiss, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI*

*Commc'ns*, 493 F.3d at 98. However, that tenet does not extend to "factual assertions [in the complaint] that are contradicted by the complaint itself, by documents upon which the pleadings rely, or by facts of which the court may take judicial notice." *Perry v. NYSARC, Inc.*, 424 F. App'x 23, 25 (2d Cir. 2011). Similarly, the presumption of truth "is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. Thus, a pleading that only offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Furthermore, if the plaintiff "ha[s] not nudged [its] claims across the line from conceivable to plausible, [its] complaint must be dismissed." *Id.* at 570.

### III. DISCUSSION

NRW's breach of contract claim is based on the theory that Sala – and, subsequently, Made Event and EZ Festivals – entered into a contract with NRW under which NRW became an equity holder in Electric Zoo entitled to fifty percent of the profits from Zoos 2009, 2010, 2011, 2012, and 2013, as well a share of the proceeds from the sale of Made Event and EZ Festivals to SFX. (FAC ¶¶ 78–86.) The alter ego and fraudulent transfer claims both arise out of the contract claim. The alter ego claim is based on the theory that Bindra and De Palma acted as alter egos of Sala, Made Event, and EZ Festival (which also acted as alter egos of each other) and must be held personally liable for those entities' alleged breaches of contract. (*Id.* ¶¶ 87–92.) The fraudulent transfer claim is based on the theory that Bindra, De Palma, Made Event, and Mister Ed improperly diverted funds from Made Event and EZ Festivals in order to avoid sharing profits with NRW. (*Id.* ¶¶ 93–98.) The Court addresses each claim in turn.

#### A. Breach of Contract

Defendants' principal arguments for why NRW's breach of contract claim must be dismissed are that: first, Defendants never assented to the Letter Agreement and, even if they did, that agreement only covers Zoo 2009; second, the contract alleged in the Fourth Amended Complaint (the "Alleged Contract") is contradicted by the exhibits attached to the complaint, including the Letter Agreement; and third, the Alleged Contract is subject to, and fails to satisfy, the statute of frauds. In response, NRW argues that: Defendants accepted the terms of the Letter Agreement, which covers all the Electric Zoo festivals, not just Zoo 2009; the Alleged Contract must be cobbled together from the Letter Agreement and various "modifications" made by the parties' conduct and subsequent writings; and the Alleged Contract is not subject to – or in the alternative, satisfies – the statute of frauds.

The parties' arguments touch on three distinct questions, which must be addressed separately: (1) whether the Fourth Amended Complaint adequately alleges the formation of a valid contract, (2) if so, what the terms of that contract are, and (3) whether the Fourth Amended Complaint adequately alleges a breach of those terms.

##### 1. Contract Formation

A prerequisite to any breach of contract claim is the formation of an enforceable contract. *Dee v. Rakower*, 976 N.Y.S.2d 470, 474 (App. Div. 2d Dep't 2013); *Rollins, Inc. v. Butland*, 951 So. 2d 860, 876 (Fla. Dist. Ct. App. 2006).

In a diversity action, a federal court must apply state law. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). To determine which state's contract formation law to apply, the Court ordinarily applies the conflict-of-law

principles of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). However, where a case has been transferred pursuant to 28 U.S.C. § 1404(a), "the transferee district court must . . . apply the state law that would have been applied if there had been no change of venue." *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964). Thus, the Court applies the conflict-of-law rules of Florida. Under Florida law, a court need not undertake a conflict-of-laws inquiry if the substantive law that would apply is identical regardless of the jurisdiction that is chosen. *Tune v. Philip Morris Inc.*, 766 So. 2d 350, 352 (Fla. Dist. Ct. App. 2000); *see also Faddish v. Buffalo Pumps*, 881 F. Supp. 2d 1361, 1368 n.3 (S.D. Fla. 2012). Here, the law of contract formation is the same in New York and Florida. Accordingly, the Court cites authority from both jurisdictions.[4]

Under both New York and Florida law, an enforceable contract is formed through the valid acceptance of an offer setting forth the material terms of the contract. *Express Indus. & Terminal Corp. v. New York State Dep't of Transp.*, 693 N.Y.S.2d 857, 860 (N.Y. 1999); *Giovo v. McDonald*, 791 So. 2d 38, 40 (Fla. Dist. Ct. App. 2001). A valid acceptance communicates the offeree's intent to be bound by the terms of the offer, *Senzamici v. Young*, 570 N.Y.S.2d 760, 761 (App. Div. 3d Dep't 1991); *Mintzberg v. Golestaneh,* 390 So. 2d 759, 760 (Fla. Dist. Ct. App. 1980), and may take any form permitted by the offer, *Farago Adver., Inc. v. Hollinger Int'l, Inc.*, 157 F. Supp. 2d 252, 258 (S.D.N.Y. 2001) (applying New York law); *Gillespie v. Bodkin*, 902 So. 2d 849, 850 (Fla. Dist. Ct. App. 2005).

Here, the Fourth Amended Complaint adequately pleads both an offer and an acceptance. Specifically, the Fourth Amended Complaint alleges that, on August 3, 2009, Pferdmenges sent Bindra an email asking him to "please double check if this [is] ok with [him]" and attaching the unsigned Letter Agreement, which set forth the terms of the proposed deal between Sala and NRW. (*See* Ltr. Agmt.) These allegations permit the inference that the email expressed NRW's willingness to enter into a deal along the terms set forth in the Letter Agreement and therefore constituted a valid offer.

The Fourth Amended Complaint further alleges that Bindra responded, in the August 6 email, by: (1) stating "This looks great though, thank you," (2) proposing that Pferdmenges correct a typographical error, and (3) seeking Pferdmenges's instructions on how to formally execute the Letter Agreement. (Aug. 6 Email.) Again, these allegations permit the inference that Bindra's statement that the Letter Agreement "looks great," coupled with his manifested intent to formally execute the agreement (as modified by the typographical correction), constituted an acceptance of the offer conveyed by Pferdmenges's email. *Mun. Consultants & Publishers, Inc. v. Town of Ramapo*, 417 N.Y.S.2d 218, 220 (N.Y. 1979) ("Where all the substantial terms of a contract have been agreed on, and there is nothing left for future settlement, the fact, alone, that it was the understanding that the contract should be formally drawn up and put in writing, did not leave the transaction incomplete and without binding force, in the absence of a positive agreement

---

[4] Contrary to Defendants' assertion, the Court cannot apply the choice-of-law provision of the Letter Agreement (Ltr. Agmt. § 8) prior to finding that the parties agreed to be bound by it. *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 119 (2d Cir. 2012) ("Applying the choice-of-law clause to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties has been established.").

that it should not be binding until so reduced to writing and formally executed."); *Hous. Auth. of City of Fort Pierce v. Foster*, 237 So. 2d 569, 572 (Fla. Dist. Ct. App. 1970). Thus, the Fourth Amended Complaint adequately pleads that when Bindra sent the August 6 email, he entered into an enforceable contract on behalf of Sala.

Contrary to Defendants' arguments, neither Bindra's proposal that the typographical error be corrected nor his question about formalization of the agreement prevented the August 6 email from constituting a valid acceptance. (Mem. at 20 n.13.) It is well-settled that a contract is enforceable even if the parties intend, but fail to follow through with, formal execution, unless the parties intend formal execution to be a prerequisite of enforceability. *Mun. Consultants & Publishers*, 417 N.Y.S.2d at 220; *Hous. Auth. of City of Fort Pierce*, 237 So. 2d at 572. Here, neither the Fourth Amended Complaint nor any of its attached exhibits suggests that Bindra or Pferdmenges agreed that the Letter Agreement would not be binding until formal execution had taken place. (Aug. 6 Email.) Indeed, the Fourth Amended Complaint alleges that, shortly after the August 6 email, NRW wired $300,000 to Made Event, which Bindra and De Palma used to operate Zoo 2009. (FAC ¶¶ 32–33.) These allegations permit the inference that the parties considered themselves to be bound by the agreement even though formal execution had not taken place and, ultimately, never took place.

Bindra's proposal that a typographical error be corrected did not prevent the August 6 email from constituting acceptance. To be valid, an acceptance must assent to the terms of the offer. *Lamanna v. Wing Yuen Realty, Inc.*, 724 N.Y.S.2d 54, 55 (App. Div. 1st Dep't 2001); *Montgomery v. English*, 902 So. 2d 836, 837 (Fla. Dist. Ct. App. 2005). A typographical error, however, is not a term of the offer, and the change Bindra proposed did not change the offer in any substantive respect.[5]

Contrary to Defendants' assertion, the Court is not bound by Judge Moore's ruling, in his opinion granting Defendants' motion to transfer, that Bindra did not accept the Letter Agreement. (Mem. at 6 (citing Doc. No. 43 at 11.).) Under the law of the case doctrine, "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case, unless cogent and compelling reasons militate otherwise." *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002) (citations and internal quotation marks omitted). The need to correct a clear error in a prior ruling is a compelling reason to reconsider. *United States v. Uccio*, 940 F.2d 753, 758 (2d Cir. 1991). The Court finds that Judge Moore's ruling, which was based on an earlier version of the complaint, was erroneous. Judge Moore found that the Letter Agreement was not accepted because it was unsigned. (*See* Doc. No. 43 at 11.) Under well-established contract principles, however, an offer need not be signed to be accepted. *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 572 (2d Cir. 1993) ("[Under New York law], [r]elevant writings creating a contract may consist of letters bearing the signature of only one party or even memoranda unsigned by either party."); *BDO Seidman, LLP v. Bee*, 970 So.

---

[5] The sentence at issue reads, "That notwithstanding, Sala, shall not be required to pay NRW more than one third of its profits from Zoo 2010 for future Zoo[s]." (Ltr. Agmt. § 6 (emphasis added).) It is clear from the context – and Bindra explicitly states in the August 6 email – that the underlined word "for" should read "or" and that the proposed correction is typographical, not substantive. (Aug. 6 Email.)

8

2d 869, 874 (Fla. Dist. Ct. App. 2007) ("[U]nder [Florida] state law contract principles, a contract may be binding on a party even without that party's signature where assent may be shown by the acts or performance of the party.").

For the reasons discussed above, the Fourth Amended Complaint adequately alleges the formation of a contract between NRW and Sala, namely, the Letter Agreement accepted by the August 6 email.

2. Construction of Contractual Terms

Having determined that the Fourth Amended Complaint alleges a valid contract, the Court now turns to construction of its contractual terms. In so doing, the Court gives force to the choice-of-law provision calling for the application of Florida law. *See Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*, 761 So. 2d 306, 311 (Fla. 2000) (holding that choice-of-law provision in contract is presumptively valid unless party resisting enforcement can show that "the law of the chosen forum contravenes strong public policy").

On a motion to dismiss, the Court may construe any contractual terms that are so clear and unambiguous that their meaning can be determined as a matter of law. *Vienneau v. Metro. Life Ins. Co.*, 548 So. 2d 856, 859 (Fla. Dist. Ct. App. 1989). Here, NRW alleges that the contractual terms must be cobbled together from (a) the Letter Agreement and (b) subsequent modifications of the Letter Agreement "confirmed" through other writings and the parties' conduct.

a. Letter Agreement

The parties dispute the meaning of the terms contained in the Letter Agreement. Defendants argue that the Letter Agreement provides for the sharing of profits from Zoo 2009 only. (Mem. at 12–14.) NRW argues that the Letter Agreement gave it a fifty-percent "equity" interest in the festival, entitling it to half of the profits from Zoo 2009 and all future Zoos.[6] (Opp. at 17.) The Court finds, as a matter of law, that the Letter Agreement unambiguously supports Defendants' position.

The Letter Agreement provides, in relevant part:

> This letter confirms our understanding regarding the operations of Electric Zoo Festival 2009 at Randall's Island ("Zoo"). Furthermore, this letter confirms our understanding regarding the repayment of capital to NRW Corporation ("NRW"), [and] the splitting of profits between NRW and Sala, LLC ("Sala").
>
> . . .
>
> 2. Repayment of Capital. NRW will make an investment of Five Hundred Thousand and 00/Dollars ($500,000.00) payable to Silly Groove Holdings, LLC ("Silly") (the "Investment"). In turn, Silly will use the Investment as working capital for the operations of Zoo . . . . NRW and Sala hereby agree that the Investment and Additional Investment, if any, shall be repaid in full on a prorated basis before any other loans are repaid or before any

---

[6] It is unclear from the Fourth Amended Complaint and from the briefing whether NRW contends that its right to profits for Zoos 2010, 2011, 2012, and 2013 arises out of: (1) the Letter Agreement itself, or (2) a subsequent modification of the Letter Agreement. The Court addresses the first argument here and the second argument in III.A.2.b.iii.

profits are distributed to any members from Zoo.

. . .

4. Sharing of Profits.  Once the Investment, and the Additional Investment and all other liabilities, if any, [have] been repaid in full from NRW and Sala, if applicable, all profits shall be distributed on an even basis with fifty percent (50.0%) of the profits being distributed to NRW and fifty percent (50.0%) of the profits being distributed to Sala.

5. Ownership.  Sala shall own all trademarks, service marks, goodwill, and all other property relating to Zoo[,] and any names, images[,] and other rights.  In the event that NRW and/or Silly are deemed to own or control any of the above rights, NRW and/or Silly agrees that all rights therein will be deemed irrevocably transferred to Sala by virtue of this agreement.  However, Sala agrees that NRW will file a security agreement . . . which lists the trademarks, service marks, goodwill[,] and all other property relating to Zoo and any names, images[,] and other rights as security for repayment of the Investment. . . .

6. Rights of Termination.  If NRW decides not to invest in Zoo 2010, and if there are any losses of the [Investment] carried forward from Zoo, then Sala shall pay NRW back 100% carried forward losses on a prorated basis from the profits, if any[,] from Zoo 2010 and any other future Zoo[s].  That notwithstanding, Sala shall not be required to pay NRW more than one third of its profits from Zoo 2010 [or] future Zoo[s]. . . .

7. Sale of Assets.  If Sala sells and/or licenses any rights in or to the name Electric Zoo prior to the completion of Zoo 2010 and if NRW has not been paid back for its share of the carried forward losses, then Sala shall repay NRW 100% prior to Sala taking any of the sale proceeds.

. . .

This language requires the Court to draw two conclusions.

First, the Letter Agreement only governs Zoo 2009.  Not only is the agreement entitled "Letter Agreement between [NRW] and [Sala] regarding Electric Zoo Festival 2009 at Randall's Island ('Zoo')," the preamble reiterates that the agreement "confirms [the parties'] understanding regarding the operations of Electric Zoo Festival 2009 at Randall's Island."  (Ltr. Agmt.)  Furthermore, the term "Zoo," as used in the Letter Agreement, is defined to mean specifically "Zoo 2009."  The plain language of the Letter Agreement supports Defendants' position that the only financing arrangement set forth in the contract is an arrangement for the financing of Zoo 2009.

Second, the Letter Agreement entitles NRW to fifty percent of profits for Zoo 2009, not a fifty percent ownership interest.  The only section in which the fifty-percent figure is mentioned is section 4, which is captioned "Sharing of Profits" and states that "all *profits* shall be distributed on an even basis with fifty percent (50.0%) of the profits being distributed to NRW and fifty percent (50.0%) of the profits being distributed to Sala."  (Ltr. Agmt. § 4 (emphasis added).)  By contrast, section 5, which is captioned "Ownership," makes no

10

mention of the fifty-percent figure and explicitly states that *all* assets, including "all trademarks, service marks, goodwill, and *all* other property," relating to Zoo 2009 are owned by Sala. (*Id.* § 5 (emphasis added).) The Letter Agreement is devoid of language suggesting that NRW is a fifty percent owner of the festival or of Sala. All NRW is entitled to is repayment of its $500,000 investment and a fifty-percent share of any profits that remain after repayment of the investment and other liabilities. (*Id.* § 4.)

NRW argues that section 6 of the Letter Agreement contemplates NRW's reinvestment in "Zoo 2010" and "future Zoo[s]" and creates an implicit option, exercisable by NRW, to reinvest in future Zoos under the same terms as the arrangement for Zoo 2009. (Opp. at 17.) The language of section 6 does not even arguably support this construction. Section 6 addresses the terms of repayment in the event that (i) NRW chooses not to reinvest in Zoo 2010 and (ii) Zoo 2009 fails to make enough money to repay NRW's $500,000 investment. (Ltr. Agmt. § 6.) It provides that, under those circumstances, NRW is entitled to repayment *on its investment* out of the profits of Zoo 2010 and "future Zoos." (*Id.*) In effect, section 6 secures NRW's investment in Zoo 2009 against the profits of future Zoos. It does *not*, however, entitle NRW to otherwise share in those profits. Section 6 is, by its plain terms, a securitization device; it is not a profit-sharing provision.[7]

---

[7] Likewise, section 5, which requires Sala to enter a security agreement with respect to all property relating to Zoo 2009, and section 7, which requires Sala to repay NRW's investment in full upon the sale or license of "any rights in or to the name Electric Zoo prior to the completion of Zoo 2010," are, on their face, securitization devices intended to limit the risk of NRW's investment.

To be sure, section 6 mentions the possibility of NRW's reinvestment in Zoo 2010 and beyond. The mere recognition of such a possibility is inadequate, however, to create a contractual right for NRW to reinvest, especially since section 6 lacks material terms that would make such a right enforceable, such as the amount of money NRW would be required to reinvest, the share of profits NRW would be entitled to if it reinvested, and whether Sala would be free to reject, in whole or in part, an offer of reinvestment by NRW.[8] *Cf. LaFountain v. Estate of Kelly*, 732 So. 2d 503, 505 (Fla. Dist. Ct. App. 1999) (finding renewal option in lease unenforceable where parties could not agree on a new rent and the option failed to specify a new rent amount or a method to determine new rent amount).

To summarize, the Letter Agreement unambiguously provides that: in exchange for a $500,000 investment, NRW would receive fifty percent of the profits from Zoo 2009 plus repayment of the investment, secured against the profits of future Zoos. (Ltr. Agmt. §§ 4, 6.) The Letter Agreement did not affirmatively grant NRW an option to reinvest in future Zoos for a continued fifty-percent profit share, though it contemplated the possibility of such reinvestment by NRW under terms not set forth in the Letter Agreement. (*Id.* § 6.)

b. Alleged Modifications

NRW argues that the Letter Agreement was modified in the following respects by subsequent writings and by the parties' conduct: (i) Made Event and EZ Festivals replaced Sala as the corporate entities through which Bindra performed; (ii) the

---

[8] As discussed above, section 4 cannot be read to supply such terms since section 4 is, like the rest of the Letter Agreement, limited to "Electric Zoo Festival 2009 at Randall's Island." (Ltr. Agmt. § 4.)

11

parties agreed to waive the requirement in section 4 of the Letter Agreement that NRW's investment be repaid before any profit distribution be made; and (iii) the parties agreed that NRW would be entitled to fifty percent of profits for Zoos 2010, 2011, 2012, and 2013, as well as a share of the proceeds if the festival were sold, so long as Made Event retained any amount of NRW's initial investment. (Opp. at 6–7.)

Under Florida law, modifications to a contract are enforceable so long as they are "mutually agreed to by the parties to the contract as well as supported by consideration." *In re Estate of Johnson*, 566 So. 2d 1345, 1347 (Fla. Dist. Ct. App. 1990). Parties can modify written contracts through subsequent writings, orally, or through performance, *Beach Higher Power Corp. v. Granados,* 717 So. 2d 563, 565 (Fla. Dist. Ct. App. 1998); *J. Lynn Const., Inc. v. Fairways at Boca Golf & Tennis Condo. Ass'n, Inc.*, 962 So. 2d 928, 930 (Fla. Dist. Ct. App. 2007), although the statute of fraud requires, under certain circumstances, that a modification be assented to in writing, *Gerry v. Antonio*, 409 So. 2d 1181, 1183 (Fla. Dist. Ct. App. 1982). Whatever the manner of modification, "[a]ll the parties whose rights or responsibilities the modification affects must consent." *St. Joe Corp. v. McIver*, 875 So. 2d 375, 382 (Fla. 2004). "Whether the parties have validly modified a contract is usually a question of fact." *Id.* On a motion to dismiss, the Court's review is limited to whether the complaint pleads facts that, if true, would constitute a modification. *Barile Excavating & Pipeline Co., Inc. v. Vacuum Under Drain, Inc.*, 362 So. 2d 117, 119 (Fla. Dist. Ct. App. 1978).

With these principles in mind, the Court turns to the three modifications alleged by NRW.

i. Substitution of Corporate Entities

NRW contends that the parties modified the contract to substitute Sala with Made Event and, subsequently, EZ Festivals. (Opp. at 6.) The Court finds that the Fourth Amended Complaint adequately pleads these modifications.

According to the Fourth Amended Complaint, NRW wired its $500,000 investment, at Bindra's instruction, to Made Event instead of Sala, and Made Event thereafter retained these funds to operate Zoo 2009. (FAC ¶¶ 32–33.) The Fourth Amended Complaint further alleges that Bindra registered the trademarks and intellectual property rights of Zoo 2009 in the name of Made Event, rather than Sala. (*Id.* ¶ 34.) The Court finds these allegations adequate to support NRW's contention that the parties agreed, through performance, to modify the Letter Agreement to make Made Event liable for the contractual obligations originally borne by Sala. Bindra indicated his assent to the modification by directing Pferdmenges to wire the funds to Made Event and by operating the festival through Made Event. NRW indicated its assent by wiring the funds to Made Event. This modification was supported by consideration, since each party agreed to extinguish the legal rights that flowed to and from Sala under the original Letter Agreement in exchange for new, identical rights flowing to and from Made Event. *See Cintas Corp. No. 2 v. Schwalier*, 901 So. 2d 307, 309 (Fla. Dist. Ct. App. 2005) ("A promise, no matter how slight, qualifies as consideration if the promisor agrees to do something that he or she is not already obligated to do.").

Far less persuasive is NRW's contention that this alleged modification made NRW an equity holder in Made Event itself. (FAC ¶ 33.) As previously discussed, the Letter

12

Agreement does not give NRW any ownership rights in the festival or in Sala. The Court thus fails to see how the substitution of Sala by Made Event could make NRW an equity holder in Made Event.

NRW argues that the parties further modified the contract in July 2010, when EZ Festivals replaced Made Event as the entity responsible for the obligations originally borne by Sala. The Fourth Amended Complaint alleges that Bindra transferred $300,000 of NRW's investment from Made Event to EZ Festivals and referred to EZ Festivals as Made Event under a new corporate name. (FAC ¶¶ 48–49.) For the reasons just discussed, the Court finds these allegations adequate to support the inference that EZ Festivals assumed Made Event's contractual obligations under the Letter Agreement, but inadequate to support the conclusion that NRW thereby became a part owner of EZ Festivals itself.

Contrary to Defendants' assertion, these alleged modifications are not subject to the Florida statute of frauds, which applies to contracts not performable within one year. *See* Fla. Stat. § 725.01. Even with the alleged modifications, the Letter Agreement covers only Zoo 2009 and hence can be performed within one year.

ii. Profit Distribution Before Repayment of Investment

NRW next contends that the parties modified section 4 of the Letter Agreement, which requires the repayment of NRW's investment prior to profit sharing. (Opp. at 7.) The Fourth Amended Complaint alleges that on December 29, 2010, EZ Festivals wired $300,000 to NRW as part of its "profit share" for Zoo 2010, along with a $20,000 interest payment, and a $30,000 "additional" interest payment, but retained $300,000 of NRW's investment. (FAC ¶ 61.) The Fourth Amended Complaint further alleges that NRW accepted this profit distribution. (*Id.*)

These allegations might be adequate to support the inference that the parties modified section 4 if it were the case that the parties agreed in the Letter Agreement to share profits for Zoo 2010. However, as discussed above, the Letter Agreement does not provide for the sharing of profits beyond Zoo 2009. Thus, any profit payment made to NRW for Zoo 2010 was not made pursuant to the Letter Agreement and does not modify it.

iii. Profit Sharing Beyond Zoo 2009

Finally, NRW contends that the parties agreed to modify the Letter Agreement to extend the profit-sharing arrangement beyond Zoo 2009. Specifically, NRW asserts that the parties agreed that, so long as Made Event or EZ Festivals kept NRW's investment, NRW would be entitled to fifty percent of the profits from future Zoos. (Opp. at 7–8, 17.) The Fourth Amended Complaint alleges that, after Zoo 2009, Pferdmenges "affirm[ed] his assent" to leave his entire $500,000 with Defendants, and that Bindra returned $200,000 of the investment, but retained $300,000 in Made Event. (FAC ¶¶ 41–44.) The Fourth Amended Complaint further alleges that, on July 12, 2010, Bindra sent Pferdmenges an email proposing two possible financing arrangements for Zoo 2010 and future Zoos. (*Id.* ¶¶ 51–53.) In response, Pferdmenges advised Bindra that he was rejecting both proposals because he believed the parties had previously agreed to a fifty-fifty profit sharing arrangement. (*Id.* ¶ 53.)

Taking all of these allegations to be true, it is clear that the parties did not agree to a modification of the Letter Agreement to extend the fifty-fifty profit share beyond

13

Zoo 2009. To be sure, the parties *did* agree, both through their writing and performance, that NRW would not seek immediate repayment of – and that Made Event would retain and use for future Zoos – part of NRW's investment. (*See* FAC ¶¶ 51–53.) The parties apparently did not agree, however, about what rights would flow to NRW from the retention of the investment. Made Event and EZ Festivals, through Bindra, offered to proceed under one of the two proposals set forth in the July 11 email, neither of which called for a fifty-fifty split. (*Id.* Ex. R.) NRW, through Pferdmenges, rejected those proposals and insisted that the parties had previously agreed to a fifty-fifty arrangement. Nowhere does the Fourth Amended Complaint allege that Defendants agreed, either in writing or through performance, that the Letter Agreement should be modified to give NRW a fifty percent share of profits for Zoos beyond Zoo 2009. NRW's expressed belief that it was entitled to a fifty-fifty arrangement was inadequate to effect a modification of the Letter Agreement. *SCG Harbourwood, LLC v. Hanyan*, 93 So. 3d 1197, 1200 (Fla. Dist. Ct. App. 2012) ("Furthermore, the unilateral modification of a contract is unenforceable."). The Fourth Amended Complaint thus fails to allege a meeting of the minds as to a material term of the alleged modification, namely, what percentage of profits NRW would be entitled to based on Defendants' retention of the investment. *Dows v. Nike, Inc.*, 846 So. 2d 595, 603 (Fla. Dist. Ct. App. 2003) ("Any subsequent modification requires consent and a meeting of the minds of the parties to the contract whose rights or responsibilities are sought to be affected by the modification.").

NRW complains that Defendants should not be permitted to retain the investment, use those funds to operate future Zoos, and yet refuse to share profits from those Zoos with NRW. (Opp. at 16.) However, the gravamen of a breach of contract claim is that the defendant made a legally binding promise that it later failed to honor. Here, it is clear from the face of the Letter Agreement that Defendants made no promise in that document to share profits after Zoo 2009. It is equally clear, based on NRW's own allegations, that Defendants made no such promise, either through words or performance, after executing the Letter Agreement. The Fourth Amended Complaint simply does not plead the existence of a profit-sharing contract that extended beyond Zoo 2009.[9]

3. Breach

For the reasons discussed above, the Fourth Amended Complaint pleads a valid contract that includes the terms set forth in the Letter Agreement, which governs Zoo 2009 only, as subsequently modified by the parties to make Made Event and EZ Festivals liable for Sala's obligations. The Court now turns to whether the Fourth Amended Complaint adequately pleads the breach of this contract.

The Fourth Amended Complaint alleges that Bindra sent Pferdmenges financial statements indicating that Zoo 2009 made no profits. (FAC ¶ 44.) However, the Fourth Amended Complaint also alleges that the statement sent by Bindra did not accurately reflect the finances of Zoo 2009, and that the statement departed from the Letter Agreement by including items not agreed upon and omitting other items. (*Id.* ¶ 45.) The Court finds that these allegations are sufficient to support a breach of contract

---

[9] As discussed, NRW has filed a pre-motion letter seeking leave to amend additional claims, including a claim for unjust enrichment for the period following Zoo 2009. The Court expresses no view of NRW's contemplated motion here.

14

claim based on the Letter Agreement. In particular, these allegations support the theory that Bindra deprived NRW of profits it was due because he misreported the financial information for Zoo 2009 and, moreover, failed to calculate the profits or losses from Zoo 2009 under the terms set forth in the Letter Agreement.

The Fourth Amended Complaint further alleges that Sala and its successors, Made Event and EZ Festivals, never actually entered into the security agreement required by section 5 of the Letter Agreement. (FAC ¶ 34.) This allegation, if true, would also constitute a breach of contract. (Ltr. Agmt. § 5.)

Accordingly, the Court denies Defendants' motion to dismiss NRW's breach of contract claim insofar as that claim is based on Defendants' alleged failure to abide by the profit-sharing provision of the Letter Agreement, which applies solely to Zoo 2009, and to execute the security agreement contemplated by section 5 of that agreement. The Court dismisses NRW's breach of contract claim insofar as it seeks profit-sharing for Zoos beyond Zoo 2009.

### B. Alter Ego Liability

NRW alleges that (1) Sala, Made Event, and EZ Festivals acted as alter egos of each other and (2) Bindra and De Palma acted as alter egos of the Entity Defendants. (FAC ¶¶ 87–92.) Under Florida law, "[t]he corporate veil may be pierced if the plaintiff can prove *both* that the corporation is a mere instrumentality or alter ego of the defendant, *and* that the defendant engaged in improper conduct in the formation or use of the corporation." *Merkin v. PCA Health Plans of Florida, Inc.*, 855 So. 2d 137, 141 (Fla. Dist. Ct. App. 2003) (citations and internal quotation marks omitted).[10]

For the reasons already discussed, the Court finds that the Fourth Amended Complaint adequately pleads that Made Event and EZ Festivals expressly assumed Sala's contractual obligations under the Letter Agreement. It is thus unnecessary to consider whether Made Event and EZ Festivals could, in addition, be held liable under an alter ego theory.

The Court also concludes that the Fourth Amended Complaint alleges facts that are sufficient to hold Bindra and De Palma personally liable for the acts of the Entity Defendants. The Fourth Amended Complaint alleges, among other things, that the Entity Defendants were owned and controlled wholly by Bindra, De Palma, or both, that Bindra and De Palma routinely funneled corporate funds to their personal accounts without observing corporate formalities, and that Bindra and De Palma did so to cheat NRW out of profits to which it was entitled. (FAC ¶¶ 3–7, 33, 45, 48, 72–74.) At least at the pleading stage, these allegations are adequate to support the inference that the Entity Defendants acted as instrumentalities of Bindra and De Palma and that Bindra and De Palma may be held personally liable for the actions of the Entity Defendants. *See, e.g.*, *Century Sr. Servs. v. Consumer Health Ben. Ass'n, Inc.*, 770 F. Supp. 2d 1261, 1265 (S.D. Fla. 2011) ("A party seeking to pierce the corporate veil and prove alter ego liability must show both a blurring of corporate lines, such as ignoring corporate formalities or using a corporation for the stockholder's personal

---

[10] NRW's alter ego claim stems entirely from the alleged breach of the Letter Agreement. Hence, the Court applies the choice-of-law provision in the Letter Agreement selecting Florida law. (Ltr. Agmt. § 8.)

15

interest, and that the stockholder used the corporation for some illegal, fraudulent or other unjust purpose." (citing *Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So. 2d 1114, 1121 (Fla. 1984))).

For these reasons, the Court denies Defendants' motion to dismiss NRW's alter ego liability claim.

### C.  Fraudulent Transfer

The Fourth Amended Complaint asserts a fraudulent transfer claim under the Florida Uniform Fraudulent Transfer Act ("FUFTA"), Fla. Stat. §§ 726.101 *et seq.*, alleging that Defendants fraudulently funneled funds from the festival to avoid sharing profits with NRW. Defendants argue that this claim must be dismissed for failure to meet the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. That argument fails because federal courts in Florida have uniformly held that a fraudulent transfer claim under FUFTA is not a "fraud" claim for purposes of Rule 9(b) and hence is not subject to that Rule's heightened pleading standard. *See, e.g.*, *Perlman v. Five Corners Investors I*, No. 09-cv-81225 (DTH), 2010 WL 962953, at *4 (S.D. Fla. Mar. 15, 2010); *Steinberg v. A Analyst Ltd.*, No. 04-cv-60898 (KAM), 2009 WL 806780, at *12 (S.D. Fla. Mar. 26, 2009); *Gulf Coast Produce, Inc. v. Am. Growers, Inc.*, No. 07-cv-80633 (KAM), 2008 WL 660100, at *6 (S.D. Fla. Mar. 7, 2008).

NRW's fraudulent transfer claim fails for an entirely different reason, however: it assumes that NRW is contractually entitled to profits from the festivals. As discussed above, this is not true beyond Zoo 2009.

As to Zoo 2009, NRW's fraudulent transfer claim is indistinguishable from its breach of contract claim, since both claims contend that Defendants diverted funds that were subject to the profit-sharing provision of the Letter Agreement. Under Florida law, a plaintiff cannot bring a tort claim for fraud based on the exact same conduct as a breach of contract claim. *HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So. 2d 1238, 1239 (Fla. 1996) ("Where a contract exists, a tort action will lie for either intentional or negligent acts considered to be *independent from* acts that breached the contract." (emphasis added)).

For these reasons, Defendants' motion to dismiss the fraudulent transfer claim is granted.

### V.  Conclusion

For the reasons stated above, IT IS HEREBY ORDERED THAT:

1. Defendants' motion to dismiss NRW's breach of contract claim is DENIED to the extent NRW alleges that Defendants breached by failing to share profits from Zoo 2009 and to execute the security agreement contemplated by section 5 of the Letter Agreement, and GRANTED in all other respects;

2. Defendants' motion to dismiss NRW's alter ego claim is DENIED; and

3. Defendants' motion to dismiss NRW's fraudulent transfer claim is GRANTED.

The Clerk of the Court is respectfully directed to terminate the motion pending at Doc. No. 111.

IT IS FURTHER ORDERED THAT the parties shall appear on October 10, 2014, at 11:00 a.m. for a pre-motion conference on

NRW's contemplated motion to amend. At the conference, the parties should be prepared to discuss whether either party seeks to enforce the arbitration agreement contained in section 9 of the Letter Agreement.

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated: September 10, 2014
      New York, New York

    \*    \*    \*

Plaintiff is represented by Ronald M. Rosengarten of Greenberg Traurig, 333 Avenue of the Americas, Miami, FL 33131, Leslie D. Corwin and Rachel Sims of Blank Rome LLP, 405 Lexington Avenue, New York, NY 10166, and Michael J. Schlesinger of Schlesinger & Associates, P.A., 800 Brickell Avenue, Suite 1400, Miami, FL 33131.

Defendants are represented by Gary P. Adelman and Sarah M. Matz of Adelman Matz, P.C., 1173A Second Avenue, Suite 153, New York, NY 10065.

```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/10/2014
```

17