UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



NRW, INC.,

        Plaintiff,

-v-

MIKE BINDRA, *et al.*,

        Defendants.

No. 12-cv-8555 (RJS)
OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge:

    Plaintiff NRW, Inc. ("NRW") brings this diversity action against Defendants Mike Bindra, Laura De Palma, Sala Corporation ("Sala"), and Mister Ed Productions, Ltd. ("Mister Ed") (collectively, "Defendants") asserting claims for breach of contract and alter ego liability. Now before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, Defendants' motion for summary judgment is GRANTED.

I. BACKGROUND

A. Facts[1]

    In October 2008, Defendant Mike Bindra, a producer of live music events, came up with an idea for a new business venture: an electronic dance music festival called "Electric Zoo" to be held on Randall's Island in New York City. (Doc. No. 149, Fourth Am. Compl. ("FAC") ¶ 12; *see also* Pl. 56.1 ¶¶ 2–4; Doc. No. 230, Pferdmenges Decl. ¶¶ 3, 5.) Bindra and his wife, Defendant Laura De Palma,

---

[1] Unless otherwise noted, the following facts are generally taken from Defendants' Local Civil Rule 56.1 Statement (Doc. No. 201 ("Def. 56.1")), Plaintiff's Counterstatement (Doc. No. 231 ("Pl. 56.1")), the declarations submitted in support of and in opposition to Defendants' motion for summary judgment, and the exhibits attached thereto (Doc. Nos. 199, 226, 233, 240, 241, 242). Unless otherwise noted, where one party's 56.1 Statement or Counterstatement is cited, the other party does not dispute the fact asserted, has offered no admissible evidence to refute that fact, or merely objects to inferences drawn from that fact. In deciding Defendants' motion, the Court has also considered Defendants' memorandum of law (Doc. No. 200 ("Def. Mem.")) and supplemental memorandum of law (Doc. No. 225 ("Def. Supp. Mem.")), Plaintiff's memorandum of law in opposition (Doc. No. 232 ("Pl. Mem.")), and Defendants' reply in further support of its motion (Doc. No. 245 ("Def. Reply")).

discussed the idea with Bindra's longtime friend and former business partner, Henri Pfedermenges, who agreed to invest in the inaugural festival ("Zoo 2009") through his company, NRW. (*See* FAC ¶ 33; Pferdmenges Decl. ¶¶ 9–18 .) At the time, similar electronic music festivals in the United States had drawn well over 50,000 people. (Pferdmenges Decl. ¶ 6.)

Between July 9, 2009 and August 13, 2009, NRW wired $500,000 to Made Event, LLC ("Made Event"), an entity owned by Bindra and De Palma, to cover various expenses related to the production of Zoo 2009. (FAC ¶¶ 4, 29, 32; Pferdmenges Decl. ¶ 24.) Around the same time, Bindra and Pferdmenges memorialized the terms of their deal in a letter agreement between NRW and Sala, a Bindra-controlled entity. (Pferdmenges Decl., Ex. I (the "Letter Agreement"); Pl. 56.1 ¶ 52.) As relevant here, the Letter Agreement provided that in return for a $500,000 investment, NRW would be entitled to 50% of any profits from Zoo 2009. (Letter Agreement §§ 2, 4.) As security for the repayment of NRW's $500,000 investment, the Letter Agreement also required NRW to provide Defendants with a "security agreement" listing trademarks and other intellectual property rights that would be transferred to NRW if its investment were not repaid. (*Id.* § 5.) As it turned out, NRW never provided a copy of the security agreement for Defendants' review. (Pl. 56.1 ¶¶ 1, 46–49.)

Zoo 2009 was held Saturday, September 5 through Sunday, September 6, 2009. (Pferdmenges Decl. ¶ 33.) More than 25,000 guests attended. (*Id.*) In connection with the production and operation of Zoo 2009, Bindra oversaw the receipt of revenues from various sources, including ticket sales, store sales, promoters, food and beverage sales, merchandise sales, booth fees, advertising, and sponsors. (Pl. 56.1 ¶ 8.) Bindra also oversaw the payment of expenses, including payments to third parties for front-of-house expenses, artist performances, marketing, technical production, leasing of the venue, vendors, merchandise, staff and security, and hired managers. (*Id.*) Bindra eventually summarized and recorded the revenues and costs on a profit-and-loss spreadsheet (the "P&L"). (Pl. 56.1 ¶ 10.) According to the

P&L, Made Event received $2,034,528 in revenue from Zoo 2009 and incurred $2,199,872 in costs, yielding a reported net loss of $165,334. (*Id.* ¶¶ 12–13; Bindra Decl. ¶ 6, Ex. 1.)

On September 22, 2009, Bindra e-mailed the P&L to Pferdmenges along with some additional spreadsheets so that Pferdmenges could see a breakdown of the costs on the P&L. (Bindra Decl. ¶ 12.) In that e-mail, Bindra noted that he was sending the P&L "as it currently stands" and that it was "not actualized," meaning that the net loss from Zoo 2009 was not final, but that he did not expect a change of more than $5,000 to $10,000 either way. (*Id.*; Bindra Decl. ¶ 6, Ex. 1.) Subsequently, Made Event paid additional expenses arising from Zoo 2009 totaling $57,628.11. (Pl 56.1 ¶¶ 30–33; Bindra Decl. ¶ 7(b), Ex. 2).

At the end of the year, Bindra and De Palma's personal accountant, Phil Tassi, prepared their tax returns, which included Made Event's revenue and expenses as a Schedule C. (Pl 56.1 ¶ 38; Bindra Decl. ¶ 11.) To enable Tassi to prepare the returns, Bindra sent him all of Made Event's bank statements, credit card statements, and other relevant documentation for the year. (Pl. 56.1 ¶ 39; Bindra Decl. ¶ 11.) Over the course of 2009, Made Event produced approximately 60 events other than Zoo 2009, each of which had its own revenues and expenses that were entered into a "general ledger" prepared by Tassi. (Pl. 56.1 ¶ 41.) Although some of the expenses on the ledger reflected payments from Made Event to Mister Ed – another entity controlled by Bindra and De Palma (Pferdmenges Decl. ¶ 66) – Tassi did not keep track of which revenues or expenses corresponded to which event held by Made Event, since such information was not relevant to Bindra and De Palma's tax return. (*Id.* ¶ 42.) Indeed, Tassi's general ledger for Made Event 2009 contains thousands of entries for revenues and expenses, many of which are completely unrelated to Zoo 2009 and were not included in the P&L. (*Id.* ¶ 44.)

In July 2010, Bindra and De Palma formed EZ Festivals, LLC ("EZ Festivals") to hold the investments in and profits of Zoo 2009 and future Electric Zoo festivals. (Pl. 56.1 ¶ 53; Pferdmenges Decl. ¶¶ 44–45.) Electric Zoo 2010 ("Zoo 2010") was held in September 2010, and yielded a profit of

about $1.5 million. (Pferdmenges Decl. ¶¶ 51, 53.) By the end of 2010, Defendants repaid NRW's $500,000 investment in full. (Pl. 56.1 ¶¶ 1, 49.) According to Pferdmenges, the Electric Zoo festivals held in 2011, 2012, and 2013 also turned a profit. (*See* Pferdmenges Decl. ¶¶ 61, 63, 71.)

B. Procedural History

In June 2012, Pferdmenges and NRW sued Defendants (except Mister Ed), Made Event, and EZ Festivals in Florida state court. (Doc. No. 1.) A few weeks later, those defendants removed the case to the United States District Court for the Southern District of Florida on the basis of diversity jurisdiction. (Doc. No. 1.) Pferdemenges and NRW thereafter filed their First Amended Complaint (Doc. No. 29), and the defendants moved to transfer the action to the Southern District of New York pursuant to 28 U.S.C. § 1404(a). (Doc. Nos. 31, 37, 41.) In November 2012, that motion was granted and the case was transferred to this District, where it was assigned to my docket. (Doc. No. 43.) About two months later, Pferdmenges and NRW filed a Second Amended Complaint asserting claims for breach of contract, breach of fiduciary duty, declaratory relief, unjust enrichment, promissory estoppel, implied contract in fact, and fraud in the inducement. (Doc. No. 54.) At a conference on July 11, 2013, the Court granted the defendants' motion to dismiss the breach-of-contract claim, finding that the contract alleged by Pferdmenges and NRW was contradicted by documents attached to the Second Amended Complaint. (Doc. No. 86 at 3:11–5:9.) The Court dismissed the remaining claims as either duplicative of the contract claim or defective as a matter of law, but allowed Pferdmenges and NRW to amend their complaint to assert a breach of contract claim consistent with the documents attached to the Second Amended Complaint, as well as claims for alter ego liability and fraudulent transfer. (*Id.* at 5:10–7:4; Doc. Nos. 84, 91.)

On September 27, 2013, NRW filed the Third Amended Complaint, asserting claims for breach of contract, alter ego liability, and fraudulent transfer. (Doc. No. 92.) The Third Amended Complaint dropped Pferdmenges as a plaintiff and added Mister Ed as a defendant. (*Id.*) After a pre-motion

4

conference, the Court permitted the defendants to file their contemplated motion to dismiss, and ordered discovery to proceed as to Zoo 2009 and Zoo 2010. (Doc. No. 107.) The motion was filed on January 8, 2014 and fully submitted on March 10, 2014. (Doc. Nos. 111, 123.) A few months later, NRW filed its Fourth Amended Complaint (Doc. No. 149), which is identical to the Third Amended Complaint except as to the correction of a defect in the allegations concerning diversity jurisdiction. (Doc. No. 150 at 5.) The Court thereafter deemed the parties' briefing and the documents attached to the Third Amended Complaint to be refiled as to the Fourth Amended Complaint. (Doc. Nos. 142, 144.)

On September 10, 2014, the Court granted in part and denied in part the defendants' motion to dismiss the Fourth Amended Complaint. (Doc. No. 150.) Specifically, the Court concluded that NRW had sufficiently alleged the existence of a contract between the parties (the Letter Agreement), but determined that the Letter Agreement only entitled NRW to 50% of the profits from Zoo 2009, with no rights to any profits from future Zoos or any ownership stake in the Electric Zoo festivals generally. (*Id.* at 9–11.) The Court further held that Plaintiffs had sufficiently alleged that the defendants had breached the Letter Agreement by failing to share profits from Zoo 2009 and by failing to enter into a security agreement. (*Id.* at 7–9.) Accordingly, the Court (1) declined to dismiss NRW's breach of contract claim "to the extent NRW alleges that [the defendants] breached by failing to share profits from Zoo 2009 and to execute the security agreement," (2) declined to dismiss NRW's related alter ego claim, and (3) granted the motion to dismiss in all other respects. (*Id.* at 16.) Several months later, NRW moved for leave to file a Fifth Amended Complaint, which the Court denied, concluding that NRW was again straining to "refashion its core claim – that it is entitled to a 50% ownership interest in the Electric Zoo music festivals – under a variety of legal theories." (Doc. No. 167 at 9.)

On January 25, 2016, after the close of expert discovery, Defendants (Bindra, De Palma, Sala, and Mister Ed), along with co-defendants Made Event and EZ Festivals, filed a motion for summary judgment and to exclude NRW's expert, Saul Solomon, under Federal Rule of Evidence 702. (Doc. No.

196.) A week later, defense counsel filed a notice indicating that defendants Made Event and EZ Festivals had sought bankruptcy protection under Title 11 of the United States Code (Doc. No. 207), prompting the Court to stay this case in its entirety pending the resolution of the bankruptcy action (Doc. No. 208). Over a year later, on June 23, 2017, the Court held a status conference at which NRW indicated that it would voluntarily dismiss the claims against the defendants in bankruptcy, and proceed against Defendants. (*See* Doc. No. 220.) On July 10, 2017, the parties filed a joint stipulation dismissing the claims against Made Event and EZ Festivals (Doc. No. 223), and the next day the Court set a schedule for the remainder of the briefing on the motion for summary judgment (Doc. No. 224). On July 28, 2017, Defendants filed a short supplemental brief on the effect of the bankruptcy on NRW's ability to pursue alter ego liability. (Doc. No. 225.) NRW filed its opposition papers on August 22, 2017 (Doc. No. 232), and Defendants filed their reply on September 8, 2017 (Doc. No. 234).

## II. Legal Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments."

*Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party "'show[s]' – that is, point[s] out . . . – that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

### III. DISCUSSION

Under Florida law, "the burden of proof is on the plaintiff to prove by a preponderance of the evidence the existence of a contract, a breach, and damages flowing from the breach." *Carpenter Contractors of Am., Inc. v. Fastener Corp. of Am.*, 611 So. 2d 564, 565 (Fla. Dist. Ct. App. 1992).[2] Here, the parties no longer dispute that the August 2009 Letter Agreement constituted a binding contract. As for the second element, NRW alleges that Defendants breached that contract in two ways: first, by failing to execute the security agreement contemplated by Section 5 of the Letter Agreement (*see* FAC ¶ 34), and second, by failing to share the alleged profits of Zoo 2009 (*see* FAC ¶ 45). However, because (1) NRW's Rule 56.1 Counterstatement concedes that NRW never supplied Defendants with a draft of the security agreement, as required by the Letter Agreement, despite Defendants' request for such a draft,

---

[2] Because the parties' briefs appear to assume that Florida law controls (*see* Doc. Nos. 200, 225, 232), the Court need not conduct a choice-of-law analysis and shall apply Florida law to NRW's claims, as it did at the motion-to-dismiss stage. *See Tehran-Berkeley Civil & Envtl. Eng'rs v. Tippetts-Abbett-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989) ("The parties' briefs . . . rely on New York law, [so] [u]nder the principle that implied consent to use a forum's law is sufficient to establish choice of law, we will apply New York law to this case.").

(2) the security agreement "turned out to be unnecessary" in light of the fact that NRW's $500,000 investment was repaid in full in 2010 (*see* Pl. 56.1 ¶¶ 1, 46–50), and (3) NRW makes no mention of the security agreement in its brief opposing summary judgment (*see generally* Pl. Mem.), the Court concludes that NRW has abandoned its breach-of-contract claim with respect to the security agreement. *See Bronx Chrysler Plymouth, Inc. v. Chrysler Corp.*, 212 F. Supp. 2d 233, 249 (S.D.N.Y. 2002).

That leaves NRW's claim that Defendants breached the profit-sharing provision of the Letter Agreement. Of course, to prevail on that claim, NRW must first show that Zoo 2009 actually turned a profit. However, as Defendants point out, over the course of six years of litigation, NRW still has not identified any evidence suggesting that Zoo 2009 made a profit or that Defendants fudged the numbers on the P&L to conceal revenues or inflate expenses. Meanwhile, Defendants have produced ample evidence – including the P&L, Bindra's testimony explaining the P&L, financial documentation supporting the P&L, and an expert report analyzing the P&L – reflecting not only that Zoo 2009 yielded a substantial net loss, but that the P&L underestimated the loss by about $50,000.

In an effort to avoid summary judgment, NRW challenges the reliability of the P&L on the grounds that the P&L is unaudited and that it fails to link Zoo 2009's reported revenues and expenses to the figures set out in Made Event's general ledger. (*See* Pl. Mem. at 6; Matz Decl., Ex. 7 ("Solomon Dep.") at 80:22–24). But NRW cites no authority for the proposition that otherwise uncontradicted financial statements must be disregarded merely because they are unaudited. And at least one court in this District has expressly held to the contrary. *See Teras Int'l Corp. v. Gimbel*, No. 13-cv-6788 (VEC), 2017 WL 3841869, at *12 (S.D.N.Y. Sept. 1, 2017) ("[A]side from complaining that the financial statements are unaudited, Plaintiff has submitted no contradictory evidence of [the] financial situation.") As for the alleged failure to cross-reference the P&L with entries on Made Event's general ledger, it is undisputed that the general ledger reflects information for dozens of *other* events, and that it was "not prepared for the purpose [of] providing profitability reports for each specific event." (Pl. 56.1 ¶ 43.)

Although NRW's expert, accountant Saul Solomon, testified that the person who prepared the P&L – Bindra – would be best able to explain the relationship between Zoo 2009, the P&L, and particular entries on the general ledger (*see* Solomon Dep. 142:25, 143:20 –146:6), NRW apparently did not depose Bindra on that point. But since the nonmoving party must provide "hard evidence," *D'Amico*, 132 F.3d at 149, "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC*, 481 F.3d at 148 (quoting *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 59 (2d Cir.1997)), NRW's speculative musings regarding Made Event's general ledger are simply not enough to raise an inference that Zoo 2009 turned a profit.

Equally fruitless are NRW's attempts to rely on Solomon's proposed "reductions" to the expenses reported on the P&L. (*See* Pl. Mem. at 9–16.) Specifically, Solomon proposed reducing the "Production" expense category by $186,500, an amount that Solomon identified in his report as "payments to Mister Ed" for design and consulting services. (Matz Decl., Ex. 3, ("Solomon Report") Schedule 6 n.1.) As noted above, Mister Ed is a company owned by Bindra (Bindra Decl. ¶ 10), so in theory, paying Mister Ed could have been a clever way to siphon off profits by disguising them as expenses. The problem with this theory, however, is that it is supported by no hard evidence and merely floats on a cloud of conjecture. Bindra testified in his affidavit that the payments from Made Event to Mister Ed totaling $186,500 "were never included on the [P&L] as expenses for the 2009 Festival" (Bindra Decl. ¶ 10), and NRW cites no evidence to the contrary. Rather, Solomon appears to have simply plucked this $186,500 from Made Event's general ledger and assumed that it was included as an expense on the P&L merely because he could not verify that it was *excluded*. (*See* Solomon Dep. *id.* 61:3-11 ("I found these payments to Mr. Ed [in the general ledger], which I believe were not appropriate deductions . . . [and] I'm assuming that they're in this [P&L], unless I can see otherwise."); *id.* at 80:5–81:2 ("I said I'm assuming it's in there unless I can prove that it's not.")). Significantly, when Defendants asked Solomon what evidence showed that the payment to Mister Ed was *included* in the P&L for Zoo

9

2009, he simply replied that "[i]t's in the general ledger." (*Id.* at 80:5–81:2.) But since it is undisputed that the general ledger included entries for dozens of events *other* than Zoo 2009, the mere existence of an entry in the general ledger reflecting a payment to Mister Ed provides no basis for finding that it was included in the P&L for Zoo 2009.

Solomon likewise proposed removing $133,552 from the "Made Production" expense line on the P&L, on the assumption that money earmarked for "Made Production" in the P&L reflected payments to a Bindra-controlled entity rather than legitimate third-party expenses. (*See* Solomon Report, Schedule 6 n.2 ("Remove payments to Made for unknown purposes.").) However, according to Bindra, the "Made Production" category captured miscellaneous "production costs and expenses that Made Event paid *to third parties* in connection with the production of the 2009 Festival" (Bindra Decl. ¶¶ 13, 16 (emphasis added)), and NRW has offered no evidence to refute that testimony. Indeed, when Bindra sent Pferdmenges the P&L in September 2009, he attached a backup spreadsheet that broke down the costs and indicated that at least some of the expenses were to third parties such as lawyers, insurance providers, and office suppliers. (Bindra Decl., Ex. 1; Gandel Decl. ¶ 2.) NRW presents no evidence to the contrary, and Solomon's assumption that "Made Production" is "an entity that Mr. Bindra controls," merely because it has the word "Made" in it (*see* Solomon Dep. 93:17–97:7; *id.* at 127:7-12), is clearly insufficient to create a genuine dispute of material fact. In the same vein, Solomon's proposed deduction of $3,300 from the P&L's expense line merely because the P&L reflects a payment to "Made mgmt" (*see* Solomon Report, Schedule 6 n.2; Solomon Dep. 93:9-16) likewise amounts to unsubstantiated guesswork on the part of NRW.

Ultimately, NRW does not dispute the vast majority of the expenses reported on the P&L. (*See* Pl. 56.1 ¶¶ 19–26, 29–33 (not disputing $2,125,287.63 of the expenses).) Nor does NRW raise a *genuine* dispute as to the reported revenue of $2,034,528 – that is, although NRW's Counterstatement indicates that this figure is "disputed" (Pl. 56.1 ¶ 17), NRW does not supply any record evidence indicating that

10

any particular revenues were underreported or omitted. To the contrary, NRW relies solely on a snippet of Solomon's deposition in which he stated that he is "unable to verify" the revenues. (Solomon Dep. 28:17–29:7; *see also id.* at 109:3-13 ("[I]t's not an issue that's been disputed at this point, other than the fact that we've been unable to verify it.").) But Solomon's failure to verify the revenues is not the same as "hard evidence" from which a reasonable inference in NRW's favor may be drawn.

In sum, as Defendants argue, NRW asks the Court to "assume that [Defendants'] evidence of the loss [from Zoo 2009] *could be inaccurate*, without pointing to any evidence to contradict Defendants' evidence." (Def. Reply at 8 (emphasis in original).) Insofar as NRW attempts to resist summary judgment on the ground that the P&L is not "conclusive" (Pl. Mem. at 6), NRW appears to forget that it, not Defendants, bears the burden of proof on its breach of contract claim, and that Defendants' burden under Rule 56 is merely to identify a lack of evidence supporting NRW's claim. *See Celotex*, 477 U.S. at 325. Indeed, where, as here, "the nonmoving party bears the burden of proof" on the issue, the moving party may simply "point out . . . that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *Id.*; *see also id.* at 477 U.S. at 323 (explaining that Rule 56 contains "no express or implied requirement . . . that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim" (emphasis in original)). Thus, to the extent that NRW asks the Court to assume that the P&L understated the profits of Zoo 2009 simply because inaccuracy or legerdemain is *conceivable*, such "conjecture" and "speculation" are insufficient to create a genuinely disputed fact. *Kerzer*, 156 F.3d at 400. For this reason, the Court grants summary judgment to Defendants on NRW's contract claim.[3]

---

[3] Because the Court dismisses NRW's claim for breach of contract, it does not reach the parties' arguments regarding alter ego liability and the effects of the bankruptcy on such liability, which turn on the viability of NRW's contract claim.

## IV. Conclusion

Over the course of six years, four complaints, and multiple rounds of dispositive motions, NRW has struggled to find a viable legal theory to vindicate what, in the end, amounts to little more than its suspicion that Defendants cheated it out of the fruits of its investment in Electric Zoo. Unfortunately, for the years in which Electric Zoo was profitable, NRW has failed to show that it had any contract to share in those profits. And for the only year in which NRW did have such a contract – 2009 – it has failed to show that there were any profits to share in the first place.

Accordingly, and for the reasons stated above, IT IS HEREBY ORDERED THAT Defendants' motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the motion pending at docket number 196, enter judgment for Defendants, and close this case.

SO ORDERED.

Dated: July 6, 2018
New York, New York

RICHARD J. SULLIVAN
United States District Judge